**STRAWBERRY WATER USERS ASSOCIATION et al.**

v.

**The UNITED STATES.**

**No. 452–73.**

United States Court of Claims.

Dec. 12, 1979.

E. Foster DeReitzes, Washington, D. C., for plaintiff. Glen A. Wilkinson, Washington, D. C., Attorney of record. Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

David Waters, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KUNZIG, Judge.

## OPINION

PER CURIAM:

This case comes before the court on the exceptions by both parties to the recommended decision and opinion of Trial Judge Kenneth R. Harkins, rendered on the parties' cross-motions for summary judgment. After hearing oral argument, and after considering the exceptions and briefs of the parties and the record, the court hereby adopts the trial judge's opinion, but with modifications and deletions as follows:

The trial judge found that the United States holds title to the lands in dispute and that the enlargement of the reservoir or the use of 20 acres for fishery activities did not constitute a taking of plaintiffs' property which would entitle them to compensation. We agree with that much of his holding.

However, the trial judge also held that plaintiffs have an interest in revenues from the land in dispute, but that in the absence of a showing that they would lose revenues currently being credited to the project, they would not be entitled to recover. Defendant challenges this portion of the trial judge's decision on the ground that there is no issue in this case regarding the right of the plaintiffs to revenues from the project, and that the court has no right to issue a declaratory judgment with respect to such revenues. Plaintiffs except to the ruling that the United States holds title to the lands in controversy. They also challenge those portions of the trial judge's opinion in which he ruled that even after construction costs are fully repaid, profits from the project lands may not be distributed to individual water users. Plaintiffs assert that they are seeking a money judgment for a Fifth Amendment taking here; that the

right to future distributions is not in issue, and that in any event, the court has no jurisdiction to rule on the question of such distributions. At oral argument, plaintiffs also made it clear that they are not suing to recover damages for a breach of any contractual right.

We agree with the parties that the right of the plaintiffs to future revenues, including the distribution of profits, is not an issue in this case and we have attempted to delete those portions of the trial judge's opinion which make conclusions of law on these questions. If any remaining portions of the trial judge's opinion should be construed as a ruling on these questions, we emphasize that we intimate no opinion, declaratory or otherwise, on the right of the association or the individual plaintiffs to future revenues or the right of any of the water users to distributions of profits.

Regardless of what interests the plaintiffs may have had in the project lands prior to 1928, we hold that as a result of the contracts entered into with the United States in 1928 and particularly in 1940, plaintiffs conveyed or relinquished to the United States and were divested of any property interest, legal or equitable, that entitles them to recover for a taking of the project lands in issue in this case and that there was no taking of a property interest owned by them in such lands.

Accordingly, defendant's motion for summary judgment is granted for the reasons stated; plaintiffs' motion for summary judgment is denied, and their petition is dismissed.

## OPINION OF THE TRIAL JUDGE

HARKINS, Trial Judge:

This taking case is before the court on cross-motions for summary judgment, and, by stipulation, the issue is limited to the nature of plaintiffs' ownership interest in the lands in dispute.[1] All facts relevant to

---

1. Plaintiffs' petition was filed December 9, 1974, and the parties completed elaborate pretrial preparation. A dispute arose about a stip-

ulation on the liability phase and on June 3, 1977, the court ordered the stipulation be stricken, with the initial determination and rec-

the liability issue are set forth in the motion papers or in the pretrial materials referenced therein; there is no genuine issue as to any material fact.

Plaintiffs are the Strawberry Water Users Association, which represents approximately 94.8 percent of the water rights in the Strawberry Valley Reclamation Project (the "project") located in Wasatch County, Utah, and 99 individuals who own approximately 3 percent of the water rights in the project.[2] Plaintiffs seek just compensation under the Fifth Amendment for the value of lands which have been taken, or are in the process of being taken, by the United States by enlargement of the Strawberry reservoir as part of the Central Utah Project, in the program authorized in 1956 to develop the upper Colorado River basin.[3] The enlargement of the Strawberry reservoir was caused by construction of the Soldiers Creek Dam, which construction began in November 1970 and was substantially completed in October 1973.

Prior to its enlargement, the Strawberry reservoir covered about 8,400 acres, of which about 8,240 acres were part of the lands in dispute; the enlarged reservoir will cover approximately 22,000 acres, and will utilize about 13,500 acres of the lands in dispute that surround the present reservoir. In addition to enlargement of the reservoir, effective May 30, 1973, the Bureau of Reclamation assumed full jurisdiction and management of approximately 20 acres of the disputed lands for the purpose of continuing certain fishery activities with the State of Utah. Plaintiffs contend they hold legal and equitable interests in the disputed lands that entitle them to compensation for the entire 22,000 acres that will be utilized by the enlarged reservoir, and for the 20 acres taken for fishery activities.

The United States holds title to the lands in dispute and will continue to hold title until Congress provides otherwise. The United States has not taken a property interest, legal or equitable, which the plaintiffs have in the lands at issue, and they are not entitled to recover compensation for a taking of a property interest under the Fifth Amendment.

Plaintiffs' claim is concerned with the status of lands withdrawn from an Indian reservation in 1905 for use in a federal reclamation project. In addition to the difficulties presented by changes over a 70-year history, the legal problem is compounded by ambiguous laws coupled with ambiguous contracts.

The federal reclamation program was initiated in 1902 to create farms on arid lands in order to continue to make tillable acreage available for homesteading. As conceived, the reclamation program provided for the United States to establish a reclamation fund in the Treasury which would finance the construction of reservoirs and irrigation works. Homesteaders would take up private farms on the irrigated lands and would pay an annual charge computed so as to return to the reclamation fund, over a 10-year period, the estimated construction cost of the project; and, through an organization, the water users would take over management and operation of the irrigation works (but not reservoirs) when the required payments had been made for a "major portion of the lands" irrigated.

ommendation on any motions for summary judgment to be made by the Trial Division pursuant to Rule 54(a).

2. The project was initiated in 1906 by a corporation named the Strawberry Valley Water Users Association; the contract between the United States and the association was terminated in 1914 and that corporation subsequently was abandoned. Plaintiff association was organized on April 25, 1922; and stock was issued to persons holding water rights in the project in the ratio of one share of stock for each acre-foot of water rights held. The association now has approximately 1,200 stockholders, each of whom own land to which water rights are appurtenant. Approximately 207 individuals own the remaining 5.2 percent of the water rights, for which no stock has ever been issued; 99 are individual plaintiffs, and the remaining 108 individuals, who hold 2.2 percent of the project water rights, are not participants in this action.

3. Act of April 11, 1956, 70 Stat. 105, as amended by the Act of September 30, 1968; 43 U.S.C. §§ 620 et seq.

This standard was interpreted to mean a point when 51 percent of the construction costs had been repaid.

By 1910, the federal reclamation program was in serious trouble. Demands on the reclamation fund were beginning to exceed the monies generated from the sale of lands from the public domain, and reclamation projects that had been undertaken were behind schedule with the result that anticipated return to the reclamation fund was not being generated. Passing years, which have included two wars and a depression, have demonstrated the original planning for reclamation of arid lands lacked feasibility. Circumstances have required many changes in reclamation concepts and projects; planned schedules could not be met; moratoria have suspended repayment obligations; and, ultimately, the repayment period has been extended to 30 years on varying bases.

The Strawberry Valley Reclamation Project was authorized by the Secretary of the Interior on December 15, 1905; preliminary work was begun in 1906; construction was substantially completed in 1915; and the first water was delivered in that year. The project was operated and maintained by the United States until 1926, when, effective October 1, care, operation, and maintenance of the project were transferred to plaintiff association. On November 30, 1974, plaintiff association paid to the United States the final installment due on the $3,499,734.22 construction costs which had been charged to the project.

In addition to the reclamation laws, and the extended course of dealings on the project, the interests of plaintiffs and the United States in the disputed lands are defined in a 1910 act of Congress, by a contract dated September 28, 1926, a supplemental contract dated November 20, 1928, and by an amendatory contract dated October 9, 1940, which expressly supersedes the 1926 and 1928 contracts. At the time the 1940 contract was executed, plaintiff association had not paid the major portion of the construction costs charged to the project.

Prior to 1910, the lands in dispute (variously referred to as "Indian lands," "watershed lands," "grazing lands," or "project lands"), a parcel that totals 56,668.51 acres, were a part of the permanent reservation for the Uintah Indians which was set apart by Presidential proclamation on October 3, 1861, and by the Act of May 5, 1864.[4] In 1902, Congress authorized allotments of lands to Indians on the Uintah Reservation, with unallotted lands to be restored to the public domain.[5] In connection with the opening of the Uintah Indian Reservation, Congress provided:[6]

> That before the opening of the Uintah Indian Reservation the President * * may also set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development, * * *.

Before the reservation was opened for entry, effective August 28, 1905, the President, by proclamation on August 3, 1905, withdrew specifically described lands for a reservoir site "necessary to conserve the water supply for the Indians or for general agricultural development."[7]

The lands in dispute in 1907 and 1909 were included in two first-form withdrawal orders by the Secretary of the Interior in order that they would be used for a reservoir site in the Strawberry Valley project. The Indian lands so withdrawn could not be opened for public entry and private ownership. The lands to be irrigated by the

---

4. 13 Stat. 63.

5. Act of May 27, 1902, 32 Stat. 245, 263.

6. Act of March 3, 1905, 33 Stat. 1048, 1070.

7. 34 Stat. 3141. By proclamation on August 14, 1905, the reservoir site description was modified and the area of land withdrawn was reduced to 60,069.51 acres. 34 Stat. 3143. On March 13, 1907, and November 12, 1909, the Secretary of the Interior, pursuant to section 3 of the Reclamation Act, included 56,668.51 acres in two first-form withdrawals for the benefit of the Strawberry Valley project; the remaining 3,400 acres were not affected by the Secretary's reclamation withdrawal orders.

project, and which are now privately held, are located across a mountain range from the Strawberry reservoir and the disputed lands, which constitute about 54 percent of the reservoir's watershed. As enacted in 1902, the Reclamation Act provided that title to, and management and operation of, the reservoirs and works necessary for the protection and operation of reservoirs should remain in the Government until Congress provided otherwise.[8]

After the lands had been set aside for the Strawberry Valley project, it was discovered that the public was using the watershed lands for grazing, without compensation to either the Indians or to the water users association. With the consent of the chief engineer on the project, the water users association started to grant leases to graze on the watershed lands and arranged annual rentals of about $10,000. By 1909, about $30,000 from this source had been paid to the Commissioner of Indian Affairs for the benefit of the Indians. In 1909, the Strawberry Valley project was investigated by a committee of the United States Senate, and at a meeting on November 3, 1909, at Spanish Fork, Utah, the president of the Strawberry Valley Water Users Association recommended that a way be found to have the grazing revenues applied to the project.[9]

This was accomplished in 1910 by Senator Sutherland in an amendment to the act making appropriations for the Bureau of Indian Affairs.[10]

The Sutherland amendment for the Strawberry Valley project (the "1910 act") consists of four sentences that: (1) extinguished Indian title in the lands by payments from the reclamation fund of $1.25 per acre; (2) included such payments in the construction costs of the project to be reimbursed by the owners of irrigated lands; (3) credited concurrently "all receipts from said lands, as rentals or otherwise" to the owners of lands irrigated by the project; and (4) provided for disposition of the "title, management and control" of the lands in the future. Although the 1910 act has the virtues of brevity and superficial simplicity, its disposition of the "title, management and control" of the watershed lands is ambiguous.

The last sentence of the 1910 act provides:

* * * All right, title, and interest of the Indians in the said lands are hereby extinguished, and the title management and control thereof shall pass to the owners of the lands irrigated from said project whenever the management and operation of the irrigation works shall so

8. Section 6 of the Reclamation Act as enacted provided:

"That the Secretary of the Interior is hereby authorized and directed to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this Act: *Provided*, That when the payments required by this act are made for the major portion of the lands irrigated from the waters of any of the works herein provided for, then the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby, to be maintained at their expense under such form of organization and under such rules and regulations as may be acceptable to the Secretary of the Interior: *Provided*, That the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress."

9. Henry Gardner, president of the 1906 Strawberry Valley Water Users Association, testified to the Senate committee, which included Senator Sutherland: " * * * It has been for a year or two grazed by the public without any compensation to the Indians or to us. We took the matter up with the chief engineer of this project, the Reclamation project of the United States, and it was left with the project here to dispose of it, utilize it as they saw fit. * * * It is a financial loss. We do not feel it is an injury to the Indians, but we would like to pay them off and get rid of them as fast as we can. We don't want to keep them indefinitely, because we feel like we will have enough to keep ourselves in the future. It is a financial proposition, and it seems to me that thirty thousand dollars of that money has now gone to the Indian department, that if we could get enough appropriation through the Reclamation project and charge up to the project to pay the Indians and get a deed and have it turned over to the Government for the project, that the revenue from that would not only pay the money back in, but would be a source of income and profit to the project in the end."

10. Act of April 4, 1910, 36 Stat. 269, 285.

pass under the terms of the Reclamation Act.

The ambiguity arises from the scope of the reference to the Reclamation Act. Both parties see the reference as to section 6 of the 1902 act. Plaintiffs construe the 1910 act as the implementation of the "otherwise provided by Congress" requirement in the second proviso of section 6 of the 1902 act, which applies to "reservoirs and the works necessary for their protection." Transfer of title to all of the watershed lands, including the reservoir, would be triggered in the future when management and operation of the irrigation works under the 1902 act standard passed to the owners. Defendant views the reference as to both provisos of section 6. Passage of management of and operation of the irrigation works is separate from title, management and operation of reservoirs, and, until Congress provides otherwise, the 1910 act excludes passage of title to so much of the watershed lands as are contained in the reservoir and the surrounding areas necessary for its protection and operation. In addition, defendant contends that section 10 of the 1902 act provides the Secretary of the Interior discretion to determine which lands the United States would retain for reservoirs and other works necessary for their protection. That determination, according to defendant, was made in 1940, at which time plaintiffs agreed that title to all of the watershed lands, which were still publicly owned, would remain in the United States and that those lands would be governed by the laws pertaining generally to reclamation projects.

The legislative history of the 1910 act is scant. The legislative history that exists indicates Congress was concerned mainly with payments to the Indians for extinguishment of their title, and with the transfer of land to provide a site for the Strawberry Valley project reservoir. These objectives were to be attained with no depletion of the reclamation fund for the cost of the land. On February 14, 1910, and on March 11, 1910, the Senate had passed provisions for the reclamation fund to be repaid for the watershed lands in a form that differed from the last two sentences that appear in the 1910 act.

S.5926, a bill to make available certain lands on the former Uintah Indian Reservation under the Reclamation Act, was introduced by Senator Sutherland in January 1910, and was referred to the Committee on Irrigation and Reclamation of Arid Lands. It was reported by the committee on February 14, 1910, and passed the Senate on that date. The committee report explained: [11]

The body of the land referred to in the bill is necessary for use in connection with the Strawberry Valley reclamation project in Utah. The project includes the construction of a reservoir for the storage of water, which, when completed, will submerge several thousand acres of land. The remainder of the land lies around and immediately adjoining that portion which will be submerged. Numerous small streams, coming from the north and south, traverse this surrounding land and constitute the source of supply for the reservoir. In order to protect the reservoir and the streams it is necessary that the same authority which controls the reservoir should control this area lying about it. The land is grazing land, and owing to its great elevation above sea level can not be made use of for agricultural purposes.

Discussion on S.5926 in the Senate reflects a concern that the reclamation fund would be depleted. At that time the troubles in the reclamation program caused by inadequate financing for approved projects were generally recognized, and Congress was being requested to augment the reclamation fund by direct appropriations in the magnitude of $30 million.[12] Senator Sutherland assured the Senate the reclamation fund would be repaid and that the lands

11.  S.Rep.No.219, 61st Cong., 2d Sess. 1 (1910).

12.  45 Cong.Rec. 1822 (1910); see also History of Public Land Law Development, Public Land Law Review Commission, Nov. 1968, at 663–70.

would constitute as much a part of the Strawberry Valley project as the reservoir itself.[13]

When the appropriations bill for the Bureau of Indian Affairs (H.R. 19028) passed the House of Representatives on February 22, 1910, it contained no provision relevant to reservoir lands for the Strawberry Valley project. In the Senate, however, Senator Sutherland on January 31, 1910, had introduced an amendment to H.R. 19028 which contained the language of S.5926. The Senate Committee on Indian Affairs reported H.R. 19028 with Senator Sutherland's amendment on March 8, 1910, and, as so amended, H.R. 19028 passed the Senate on March 11, 1910. The Indian Affairs Committee Report [14] included a February 18, 1910, letter in which the Secretary of the Interior approved inclusion of the amendment in the appropriations bill.[15]

As passed by the Senate, the Sutherland amendment to H.R. 19028 (as in S.5926) contained three sentences. The third sentence provided for the extinguishment of the Indian title:

* * * All right, title, and interest of the Indians in the said lands are hereby extinguished, and the same shall be available in connection with the operations under the reclamation Act, and any proceeds arising therefrom as rentals or oth-

erwise shall be covered into the reclamation fund.

Although the Senate-passed language would assure that all of the Indian title to the watershed lands would be available in connection with the Strawberry Valley project reservoir, which was specifically identified in the first sentence, the last sentence could be construed to mean that any proceeds arising from the lands would go into the reclamation fund generally, where they could be used on other projects, in other states. In conference committee, the last sentence of the Sutherland amendment to H.R. 19028 was rewritten into two sentences. The sentences specifically provided that any revenues from the watershed lands would be applied to the costs of the Strawberry Valley project, and related the transfer of the Indian title to the terms of the Reclamation Act.

The conference committee's amendment (No. 136) was explained by the managers for the House of Representatives as follows:

No. 136 provides for extinguishing the Indian title to a reservoir site used for a reclamation project in Utah. The appropriation of approximately $63,750 is to be paid from the reclamation fund.

13. 45 Cong.Rec. 1822 (1910). The following exchange took place:

"Mr. SUTHERLAND. These are public lands, but they are charged with a trust for the benefit of the Indians.

"Mr. HEYBURN. Then, should not that trust be discharged out of the Treasury of the United States? Is there any justification for diverting the proceeds of the sale of public lands from the reclamation fund to pay a private debt?

"Mr. SUTHERLAND. These lands ultimately go into this project and constitute a part of it.

"Mr. HEYBURN. But if the Senator will allow me——

"Mr. SUTHERLAND. If the Senator will permit me, they constitute a part of the project just as much as the reservoir itself or the work which is constructed in connection with the reservoir. It is proper that the reclamation fund should bear the burden of it, precisely as it bears the burden of constructing the reservoir or the tunnel through the mountain which is connected with the reservoir. I will assure the Senator that the reclamation fund will not

suffer. Before the tunnel is constructed the rental arising from the land, which will be returned to the reclamation fund, will be a large portion of the money that has been paid."

14. S.Rep.No.357, 61st Cong., 2d Sess. 24 (1910).

15. The Secretary's letter stated:

"On February 10, 1910, the department reported on Senate bill No. 5926 to the Hon. Thomas H. Carter, chairman of the Committee on Irrigation and Reclamation of Arid Lands, which has the same object as the amendment now under consideration.

"No part of the land to be affected by the amendment is allotted to Indians, and they do not live in the vicinity. This department knows of no cause for objecting to the taking of the land for the purpose covered by the bill. The price to be paid is the lawful rate of compensation to the Indians for this class of land, and I have no objection to the amendment being included in the Indian appropriation bill."

The conference committee report was agreed to by the Senate without a vote on March 24, 1910, and by the House on March 25, 1910.[16] There was no discussion in either body of amendment No. 136.[17]

What Congress intended in the last sentence of the 1910 act for disposition in the future of "title management and control" of the watershed lands cannot be divined from the language of that sentence alone. The sentence as readily may mean that the owners in the future are to get "title management and control" of the reservoir on the happening of an event within the terms of the Reclamation Act as it may mean that "title management and control" of the reservoir, within the terms of the Reclamation Act, is to remain in the Government until Congress otherwise provides. In these circumstances, the intent of Congress must be found from the 1910 act in its entirety and in the light of the factual context that existed at that time. In cases that involve statutory ambiguity, guidance is found in the provisions of the whole law, the circumstances that existed at the time it was passed, and the objectives sought in the legislation.[18]

In 1910, the Strawberry Valley project was in its initial stages, and construction would not be completed for 5 years. It is clear that Congress intended the Indians were to be paid for the lands, and that the lands were intended to be used for a reservoir and protection of its watershed. Nothing is found in the legislative history of the 1910 act, and no contemporaneous statement now available was made by any person concerned with its enactment, however, which would indicate any intention, at any time, to confer on the water users title, management or control of the reservoir or the works necessary for their protection. In 1910, Congress was concerned that funds from the reclamation fund used to make the purchase from the Indians would be reimbursed from income expected to be derived from the lands. Disposition of title, management and control of the watershed lands was to pass in accordance with disposition of lands in the reclamation program. On two occasions the Senate approved language that would accomplish this purpose, and nothing suggests that the amendment made by the conference committee was intended to do more than clarify these objectives. The conference committee amendment relative to future disposition of "title management and control" should not be construed to do violence to the provisions of the 1902 act applicable to reservoir lands, or to enlarge the purposes sought by the sponsors of the Sutherland amendment and the purposes enunciated by the President and by the Secretary of the Interior for the withdrawals from the Indian reservation.

In the reclamation program in 1910, management and operation of the irrigation

16. 45 Cong.Rec. 3692 (1910); 45 Cong.Rec. 3771 (1910).

17. The Sutherland amendment, as amended by the conference committee (the "1910 act"), in its entirety reads:

"That the Secretary of the Interior is hereby authorized to pay from the reclamation fund for the benefit of the Uintah Indians the sum of one dollar and twenty-five cents per acre for the lands in the former Uintah Indian Reservation, in the State of Utah, which were set apart by the President for reservoir and other purposes under the provisions of the Act approved March third, nineteen hundred and five, chapter fourteen hundred and seventy-nine, and which were by the Secretary of the Interior withdrawn for irrigation works under the provisions of the reclamation act of June seventeenth, nineteen hundred and two, in connection with the reservoir for the Strawberry Valley project. Such payment shall be made in five annual installments, and the moneys paid shall be subject to the same disposition as the proceeds of the sales of lands in the former Indian reservation. All such payments shall be included in the cost of construction of said Strawberry Valley project to be reimbursed by the owners of lands irrigated therefrom, all receipts from said lands, as rentals or otherwise, being credited to the said owners. All right, title, and interest of the Indians in the said lands are hereby extinguished, and the title management and control thereof shall pass to the owners of the lands irrigated from said project whenever the management and operation of the irrigation works shall so pass under the terms of the Reclamation Act."

18. *United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); *Akins v. United States*, 439 F.2d 175, 177, 194 Ct.Cl. 477, 483 (1971).

works of a project were planned to pass to the owners of the lands irrigated by the project when the payments required by the act had been "made for the major portion of the lands irrigated from the waters of any of the works" in the project.[19] Title to, and management and operation of, all reservoirs and works necessary for their protection and operation, however, were required to remain in the Government until Congress provided otherwise. The lands from the Indian reservation were obtained for the purpose of utilizing them for a reservoir; and the reservoir that was to be constructed would occupy both lands from the Indian reservation and other lands which had been withdrawn from the public domain for the benefit of the project. The watershed of the reservoir needed protection for both the former public domain lands and the Indian lands. In these circumstances, the reference to the Reclamation Act in the last sentence of the 1910 act is better construed to mean that title, management and control of the watershed lands were to be subject to the same disposition in the future as applied to other lands in the reclamation program that were utilized for reservoirs and were necessary for the protection of reservoirs.

The 1910 act's provisions for disposition of revenues from the watershed lands were separate from, and different from, the provisions related to title, management and control of the lands. The Indians were authorized to be paid in five annual installments, and such payments were to be included in the project's construction costs when made. Although disposition of title, management and control of the watershed lands was deferred to the future, all revenues from the lands when received were subject to the landowners' right to have them credited to the construction costs.

From 1910 to October 1, 1926, the Bureau of Reclamation managed operations in the project. During this period, the Bureau accumulated net revenues of $160,715.01 from its administration of leases on the watershed lands.[20]

Net profits from the watershed lands, before taxes and depreciation, from 1926 to October 31, 1976, totaled $1,709,239; of which $757,578 were from grazing leases; $466,838 were from recreational activities; and $484,823 were from oil and mineral exploration leases. Net profits of $2,966,043 were credited to the plaintiffs from the two hydroelectric power plants which are on the project but not on the watershed lands. Since November 30, 1974, the date on which the final installment due on the construction costs was made, to October 31, 1976, net profits from activities on the watershed lands and from the power plants amount to approximately $400,000 before taxes and depreciation.

The right to have the revenues from the watershed lands credited when received to its construction cost account created a status in the Strawberry Valley project that was unique. This status vested on enactment of the 1910 act; it made management and control of the watershed lands and the reservoir different from management and control of reservoirs and their adjacent withdrawn or acquired lands in other reclamation projects. Protection of this unique status in revenues from the watershed lands created confusion in the theories and concepts related to the transfer of title, management and control of the watershed lands which the 1910 act deferred to the future. This confusion was intensified by the change in the reclamation program in 1924 in which care, operation and maintenance of a project was transferred to the water users association before 51 percent of the construction costs had been repaid.

19. The meaning of the phrase "major portion of the lands" in the 1902 Reclamation Act is ambiguous. Throughout the history of the Strawberry Valley project, however, this phrase was interpreted by the parties as meaning the point at which 51 percent of the project construction costs were repaid.

20. In the 1926 contract, this amount had not been credited to the construction account repayment, but was to be taken into account in the July 1, 1930, restatement of financial relations.

Protection of its right to watershed revenues involved the water users association in disputes from the beginning. Some disputes were concerned with internal reclamation program matters, such as the right to grant leases or other administrative prerogatives or compliance with Reclamation Bureau recreation policies. Other disputes were concerned with attempts by outsiders to gain control over or to use the lands. In these conflicts, the parties used terminology and concepts that would support the positions that were then at issue. In the process, argument applicable to the status of the right to current revenues became intermingled with ideas about the status of title and control in the future. As a result plaintiffs' efforts to protect their right to present revenues from the watershed lands and defendant's administration of the reclamation program are reflected in documents that are permeated with concepts about "vested" legal rights from the 1910 act, "purchase and sale" of watershed lands, and "trustee's obligations" relative to "equitable title." These concepts became ingrained in the attitudes of the parties and in their communications over the years; they lacked precision in use and their content varied with the circumstances.

The most serious and continuous threat to the water users' right to revenues from the watershed lands came from stockraising interests in Wasatch County who wanted access to the lands for grazing. This controversy endured from 1908 to 1930; throughout this period the lands were leased under written leases executed through the Bureau of Reclamation. The controversy included attempts by the Wasatch County Grazing Association to get Senator Sutherland to consent in 1915 to a modification of the 1910 act, and an attempt in 1922 to add the lands to the Uintah National Forest and thereby transfer jurisdiction over grazing permits to the Forestry Service in the Department of Agriculture. The stockmen in 1925 brought suit in the District of Columbia against the Secretary of the Interior to restrain the Secretary from crediting grazing revenues to the Strawberry Valley project, and to transfer to the reclamation fund all such revenues previously so credited. In all of these disputes, Bureau of Reclamation officials supported the positions taken by the water users.

Senator Sutherland, in a letter dated December 31, 1915, to the water users, reported on his conversations with Interior's Assistant Secretary in charge of grazing leases on the watershed lands. Senator Sutherland stated that the association's fears that the lands would be thrown back in the forest reserve were groundless because he had reviewed the 1910 act with the Assistant Secretary who had assured him that the Interior Department "had not the remotest idea of interfering with the rights which this law grants you and he agreed with me that the law gives you a vested right in these lands. I drew it myself with great care with the intention to accomplish this result." With respect to the last two sentences of the 1910 act, Senator Sutherland's letter states:

* * * So you see the lands are bought and paid for and the Indian title is extinguished. The owners of the water rights reimburse the reclamation fund for these lands the same as they do for the irrigation project, and when the final payment is made by the owners, the title, management and control of these lands passes to the water owners at the same time that the management of the irrigation works passes to them. Under this law there is no doubt that the Interior Department has no power to interfere with the status of the lands and my opinion is that even Congress itself could not deprive you of the rights conferred because those rights have become vested by payment. At any rate, you may be sure that as long as I am in the Senate, I shall not permit your rights to be interfered with without resistance to the full extent of my ability. However, I do not think that any such attempt will be made, and if made, I have no doubt it would be unsuccessful.

Plaintiffs cite this letter to show the intent of Congress in 1910. Statements made by a bill's author 5 years after enactment form a hazardous base for inferring the intent of

an earlier Congress.[21] The reed becomes more slender when the statements are made in the context of a vigorous dispute. In an atmosphere as volatile as the one that surrounded the reclamation program in 1915, Senator Sutherland's statements relative to vesting of title to reclamation program reservoirs after full repayment of construction costs are not persuasive. His interpretation, however, appears with regularity in subsequent reclamation program administrative records.

In the early years of the reclamation program, federal administrators viewed the Government's role as a temporary trust relationship, with title to the projects ultimately to be transferred to the water users. In 1921, for example, the Secretary of the Interior was advised he had authority to grant a railroad right-of-way over the watershed lands without specific direction from Congress, notwithstanding the unique status created by the 1910 act. The Solicitor of the Department compared the 1910 act with section 6 of the 1902 act and noted that, while there was a slight difference between them, no material or controlling distinction could be made as to the purpose intended. The memorandum dated October 18, 1921, stated:

* * * But even if title to the reservoirs in this case may ultimately pass to the owners of the irrigated lands without . further act of Congress, nevertheless the relationship between the Government and the water users is the same in legal effect as that existing in respect to other projects under the general reclamation act. In all such cases, the Government holds the title as trustee for the benefit of the water users under the project, with a view of ultimately relinquishing title and management and giving full control to the owners of the irrigated lands. As such trustee, the Secretary is presumed to act in the interest of the prospective water users whose lands must bear the burden of the cost of the project.

In a letter dated September 7, 1922, the Department of the Interior commented on a bill to transfer the watershed lands to the Uintah National Forest. This comment notes that the bill would repeal the 1910 act and its effect would be "to divest the landowners of such title and interest as they acquired under the said act of 1910 and also the benefits of the obligation for repayments assumed by them as well as the benefits of the payments already made." Enactment, further, would deprive the landowners of the rentals which could be secured from the watershed lands "after they have obtained full title which will pass under the law by reason of complete payment for the project." The controversy around the question of whether the 1910 act modified the 1902 reclamation law "to the extent of passing title to these lands instead of holding title as a sort of trust, as implied by the reclamation law in general" was noted and the following statement made:

Neither in this section of the reclamation law nor in any other enactment regarding it is there a provision for the transfer of title to the project works and property and the discussion revolved around the question whether the act of 1910 being subsequent to the act of 1902 modified the reclamation law to the extent of passing title to these lands instead of holding title as a sort of trust, as implied by the reclamation law in general.

For the present discussion it is immaterial whether the law actually requires the title to pass, because the act of 1910, in connection with the reclamation law in general, must be construed as transferring to the landowners a valuable right for which they have assumed an obligation to make full payment and have up to date made payment substantially in accordance with the contractual obligations assumed and have in fact made payment of a considerable part toward the amount due on account of these lands.

21. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 349, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1959); *Appa-* *lachian Regional Hospitals, Inc. v. United States*, 576 F.2d 858, 869, 217 Ct.Cl. ——, —— (1978).

The continuing controversy between the water users and the stockmen of Wasatch County was described in a letter dated December 29, 1924, from the water users association to Senator Smoot. The letter traces use of the watershed lands for grazing purposes when they were under the control of the Indian Bureau and after 1908, when the Reclamation Bureau took over leasing responsibility. The effects of the 1910 act and the 1924 Fact Finders Act were explained as follows:

These lands have been bought by the United States from the Indians and the Indians have been fully paid for the lands. Under the law the water users of this project are to get the title of these lands and they have given the government mortgages upon their farms to secure the payment of their water charges and after these payments are made title to the lands will pass to them by virtue of the Act of April 4th, 1910. And under the Fact Finder's bill, Congress has during this very month, re-affirmed its intention to pass title to this land to the project water users and also to give the water users the benefit of the income from the land as fast as it is earned. It appears, therefore, that the United States had definitely committed itself on the question of disposing of these lands in such a way that it can not now retract from these committments without breaking its contract with thousands of water users on this project. Of course we do not think the United States would do such a thing.

In 1920, the water users secured the lease for the watershed lands from the Bureau of Reclamation and subleased grazing rights to the stockmen. This development was explained to Senator Smoot as follows:

In the fall of 1920 a grazing lease upon these lands held by the Heber people, expired and they were desirous of renewing their lease and proposed to the Reclamation Officials that they be given a new lease for five years at the same price they had previously paid. Also at this time the water users told the Reclamation Officials that they wished to lease this land

themselves and were willing to pay the price previously paid by the Heber people. They also stated that they were opposed to any lease being made from the Reclamation Bureau to the Heber people direct, as the Heber people were unwilling to recognize the rights of the water users in these lands. The water users stated that if the Heber people were unwilling to recognize their rights by subleasing from the water users, then the water users would continue to object to a lease being made to the Heber people. After two conferences between the water users, the Heber people, and the Reclamation Officials were held at Provo, the Heber people finally agreed to not question the rights of the water users in these lands and to accept the sublease from the water users for a period of five years at the previous rate of payment. At this time the water users agreed to sublease to the Heber people with the explicit understanding that the Heber people would so shape their affairs so that they could withdraw completely and permanently from these lands at the expiration of the new five year lease. This lease expires at the close of 1925.

According to a memorandum dated December 9, 1930, from the Commissioner of Reclamation, the watershed lands and the withdrawn lands in 1925 had been advertised for leasing and were leased to the highest bidder, an outside stockman, for a 5-year term that would expire December 31, 1930. On September 4, 1925, the lessor subleased certain of these lands to the Strawberry Water Users Association as part of an adjustment between the rival interests seeking to use the watershed lands. The memorandum noted that the association had taken over control of the project in 1926 and that the water users in 1930 had paid about 33 percent of the construction costs. To that extent, according to the memorandum, "they have under the act of 1910 obtained what might be designated quasi-equitable title to an interest in the purchased grazing lands"; and because "the United States still holds 67 percent of

the equitable ownership of the purchased lands," the Bureau could object and control the association if overgrazing rendered the watershed lands of less value for protection of the reservoir.

Plaintiff association assumed responsibility for care, operation, and maintenance of the project, including the watershed lands, on October 1, 1926, under a contract dated February 28, 1926 (the "1926 contract"). The 1926 contract preserved the special status in the water users' right to revenues from the watershed lands and reflected the confusion that had arisen about the relationship of that status to the future transfer of title.

In 1902, the Reclamation Act provided that management and operation of the irrigation works would pass to the water users when payments had been made for the major portion of the lands irrigated. In 1924, the Fact Finders Act [22] changed this standard. Formation of a legally organized water users association was required, and the association would take over the care, operation, and maintenance of the project works "[w]henever two-thirds of the irrigable area of any project, or division of a project, shall be covered by water-right contracts between the water users and the United States." [23] The owners of the lands irrigated from the Strawberry Valley project in 1926 did not meet the criteria of the 1902 act and could not take over project management and operation; they could, however, meet the new standard in the 1924 act.

The 1926 contract transferred to the association the care, operation, and maintenance of the entire Strawberry Valley project in Utah and all its works except the Mapleton and Springville lateral and the High Line Canal. Paragraph 5 of the contract's explanatory premises recited that 56,869.51 acres of land had been purchased under the 1910 act, and incorporated by reference an annexed schedule A which particularly de-

lineated the lands and was captioned "Description of Lands Purchased for protection of the watershed of Strawberry Reservoir, under authority of the Act of April 4, 1910 (36 Stat. 285)." Paragraph 5 stated the watershed lands "protect the watershed of the Strawberry Reservoir, is a part of said project, is valuable for grazing purposes, and is hereinafter referred to as watershed land."

Article 22 of the 1926 contract recognized the special status of the watershed lands. Receipts from the lands after October 1, 1926, were directed to be collected by the association and the net receipts to be credited to the association under subsection I of section 4 of the 1924 act. Parenthetical statements, however, permitted the possibility that care, operation and maintenance could be transferred at a time other than October 1, 1926, and that distribution of the net receipts could be credited by court order otherwise than as directed by subsection I of section 4. [24] The provisions of the 1910 act relative to the passage of title, management and control were quoted in article 22, which then concludes with the following statement:

> * * * It is understood that the title, management and control of said purchased land is not to pass to the Association under said Act unless and until at least 51 percent of the project construction cost is paid to the United States, the Secretary's decision as to said date to be final and binding upon both parties hereto.

The association took over the care, operation, and maintenance of the entire Strawberry Valley project on October 1, 1926, and net revenues from the watershed lands that accrued between October 1, 1926, and November 20, 1928, were credited to the association. There is no record of correspondence or discussions that involve questions about the association's relationship to the

---

22. The Act of December 5, 1924, 43 Stat. 701 (the "1924 act").

23. 43 U.S.C. § 500 (1970).

24. Article 20(c) also provided for the contingency that care, operation and maintenance could be turned over at times other than October 1, 1926.

watershed lands in the period between the 1926 contract and a supplemental contract entered into November 20, 1928 (the "1928 contract"). The explanatory premises in the 1928 contract, however, distinguish watershed lands from other project works, and assert that care, operation, and maintenance of the watershed lands did not pass to the association by the 1926 contract. The premises also assert, in the interest of economical administration of the water users "for whose benefit said lands were purchased," that "management and control (but not title)" should be transferred to the association even though 51 percent of the project construction costs had not been paid. Article 10 of the 1928 contract assured continuation of the credit for revenues from the watershed lands and reemphasized the association's right to manage existing and future contracts that produced such revenues.[25]

After extensive negotiations during most of the 1930's, an amendatory contract was executed on October 9, 1940 (the "1940 contract") that superseded both the 1926 contract and the 1928 contract. During the negotiation period, the primary concern was with an extension of the time for payment of unaccrued balances on various obligations and the question of title does not appear to have been a matter of negotiation or dispute. The transmittal memorandum makes it clear that the Bureau intended the 1940 contract to bring all aspects of the contract relationship in the Strawberry Valley project into one instrument, and that the primary purpose, as seen by the Bureau, was to take advantage of the time extensions authorized by the 1939 amendments to the Reclamation Act.[26]

During the negotiations, the Bureau of Reclamation representatives were insistent that the United States retain title to the watershed lands, which usually came to be called grazing lands.[27] The association during these negotiations, on the other hand, was concerned that the right to income from the watershed lands would be retained and credited to the association's obligations. If the association were to receive title to the watershed lands, however, such receipt would have the unwanted result that the association would be subject to liability for Wasatch County taxes.

In the 1940 contract, the watershed lands were identified as those specified in the 1910 act and were redesignated as grazing lands. The parties agreed, notwithstanding the 1910 act, that the United States would retain title until otherwise provided by Congress, while management and control were continued in the status that had been estab-

---

25. Article 10 provided:

"Said contract of September 28, 1926 be and the same is hereby modified to the extent that the care, operation and maintenance, (management and control but not the title) of said 56,869.51 acres of land be and the same is hereby transferred to the Association to be utilized by it for the benefit of the owners of the lands irrigated from said project and may collect and use the receipts from any contracts now existing or which may hereafter be made by the Association provided said receipts shall be distributed as specified in Article 22 of said contract dated September 28, 1926, and provided further, that said transfer shall be subject to the terms of any and all existing contracts concerning or affecting said lands."

26. The transmittal memorandum, dated August 30, 1940, states in part:

" * * * The primary purpose of the contract is, of course, that of granting extensions of time for repayment as authorized by the Reclamation Project Act of 1939 (53 Stat. 1187); these extensions being confined to various obligations heretofore on a fixed 20 or 30 year basis and a floor being placed, in the case of individual contracts, withholding full extensions where full extensions would result in unjustifiable low annual installments." The August 30, 1940, memorandum was referred to the Solicitor's office and was returned to the Secretary for signature on September 21, 1940.

27. On April 17, 1935, the Bureau of Reclamation submitted a draft contract which contained the following provision:

"12. No title to any of the property, the care, operation and maintenance (management and control) of which was transferred to the Association pursuant to said Association-Government contract shall pass to the Association, but it is specifically understood and agreed that the United States retains the title to the entire Strawberry Valley Project, including the grazing lands (also referred to as water shed lands in said Association-Government contract) and power system."

lished in the 1926 contract.[28] Other provisions in article 23 of the 1940 contract retained title, until otherwise provided by Congress, to all the works and property which were transferred to the association for its care, operation and maintenance by the 1926 and 1928 contracts as well as "such property as has been added to the project works, including additions to the power system, by the Association.  *  *  *."

As of January 1, 1940, the United States had invested $90,069.50 in the power system on the project and plaintiff association had invested $90,218.68. The parties agreed that the annual net profits of the power system were to be apportioned on the basis of the respective investments. The association continued to operate and maintain the power system, subject to the reservation that the Secretary approve all power contracts and additional capital investments. Net profits from the watershed lands and from the Government's investment in the power system continued to be credited to the water users in conformance with the requirements of subsection I of section 4 of the 1924 act.[29] In the event the United States resumed control of the watershed lands or the power system because of default, however, profits attributable to the association's investment in the power system were to be segregated from subsection I accounts. Profits apportionable to the association's investment in the power system were to be accounted for as directed by plaintiff association, but other profits were to be credited annually to obligations to the United States in a manner consistent with subsection I.

The Solicitor's office of the Department of the Interior frequently has been requested for advice about the legal status of the watershed lands. In addition to the October 18, 1921, opinion, the record contains five memoranda from the office of the Solicitor; all were written after execution of the 1940 contract, two were concerned with the enlargement of the reservoir that is the subject of this case. These memoranda demonstrate the continuing intermixture of concepts related to the right to a current credit for net profits provided by the 1910 act with concepts that involve a future transfer of title to the watershed lands. In the process of disposing of problems incident to administration of the right to current revenues, however, statements were made about "vested" rights and "equitable title" that were not essential to the problem at hand and which inserted an element of confusion about a transfer to be made in the future. In structure, the memoranda generally traced the legislative and administrative history of the watershed lands, which tended toward a repetition of ideas that had been associated previously with the status of the watershed lands.

Plaintiffs rely upon extracts from memoranda from the Solicitor's office and communications prepared by Bureau of Reclamation officials as a demonstration of a consistent history of administrative interpretation that supports the position for

28. Article 20 of the 1940 contract provided as follows:

"20. Notwithstanding the provisions of the Act of April 4, 1910 (36 Stat. 285), it is agreed that title to the lands described in the attached schedule A (being the same as the lands described in schedule A of the contract of September 28, 1926, and being hereinafter called grazing lands) shall be retained by the United States until otherwise provided by Congress. The management and control of said lands shall remain with the Association subject to the provisions of Article 34 of this contract."

29. Subsection I of section 4 of the 1924 act provides:

"[That w]henever the water users take over the care, operation, and maintenance of a project, or a division of a project, the total accumulated net profits, as determined by the Secretary, derived from the operation of project power plants, leasing of project grazing and farm lands, and the sale or use of town sites shall be credited to the construction charge of the project, or a division thereof, and thereafter the net profits from such sources may be used by the water users to be credited annually, first, on account of project construction charge, second, on account of project operation and maintenance charge, and third, as the water users may direct. No distribution to individual water users shall be made out of any such profits before all obligations to the Government shall have been fully paid." 43 U.S.C. § 501 (1970).

which it contends: that the water users were vested with the full equitable title to the watershed lands, with legal title scheduled to pass, as a matter of course, when 51 percent of the construction costs were repaid. Plaintiffs read too much into these communications. The record of consistent interpretation over successive years cited by plaintiffs is a manifestation of the tendency of an idea, once introduced, to become ingrained and to perpetuate itself in communications in a bureaucracy.

In 1950, advice was sought from Interior's Solicitor on the validity of five oil and gas leases, three of which were entirely on the watershed lands and two of which were partially on the watershed lands. The leases had been made by the Department of the Interior and subsequently ratified by plaintiff association on condition that the rentals and royalties from the leases be credited to the association. Advice also was sought on whether the proceeds from the leases should be distributed as provided either by the Mineral Leasing Act or by subsection I of the Fact Finders Act.

In a memorandum dated December 7, 1950, the Solicitor advised that the Secretary had no authority under either the Mineral Leasing Act of 1920 or the Mineral Leasing Act for Acquired Lands of 1947 to execute oil and gas leases on the watershed lands. Pursuant to the 1940 contract, the watershed lands were under the management and control of the association, and such power clearly included the authority to issue oil and gas leases. The watershed lands were found to be subject to leasing by the association, and proceeds from the leases were to be applied in conformity with the 1910 act and subsection I of section 4 of the Fact Finders Act. In the course of a discussion of the legislative history of the 1910 act, the opinion observed:

\* \* \* These provisions strongly suggest, if they do not require, the interpretation that Congress intended by the 1910 act to sell the watershed lands to the landowners in the Strawberry Valley project, and to transfer the equitable title to the landowners pending the transfer of legal title. Otherwise, there would be no reason to credit the landowners with the receipts derived from the watershed lands.

The opinion concluded that "although the legal title to the watershed lands is still in the United States, the beneficial interest in these lands is vested in the owners of the lands irrigated from the Strawberry Valley project."

In 1951, the Solicitor supplemented the opinion that the Department of the Interior was without authority because of the 1940 contract to lease any of the watershed lands. The problem at that time involved administration of the two leases that covered both portions of the watershed lands and the 3,200 acres of land adjacent to the reservoir which were non-watershed lands. The November 1, 1951, opinion noted, although the leases in question made by the Department were ineffective insofar as they embraced the watershed lands, there was no question of their validity because they had been ratified and approved by the association pursuant to the management and control vested by the 1940 contract. The opinion recommended that the leases be modified to segregate leases on watershed lands from leases on lands properly within the Department's authority.

In 1967, the Regional Solicitor, Salt Lake City, reviewed the status of the title to the watershed lands and on July 25, 1967, advised the Regional Director of the Bureau of Reclamation that the United States had retained title to the watershed lands in the 1926 and 1928 contracts, and that its interest in the lands would continue after the original cost had been repaid. The memorandum concludes:

Based upon the foregoing it is our opinion that the United States retains the legal title to the 56,868.51 acres of land withdrawn in 1907 and 1909 and described in Schedule A of the 1940 contract and the Strawberry Water Users Association owns the beneficial interest therefrom.

On November 14, 1968, the Assistant Solicitor, Reclamation and Power, rendered an opinion to the Regional Solicitor, Salt Lake

City, on ownership of lands adjacent to the Strawberry reservoir. In this memorandum, the Solicitor's office advised that the 1910 act was within the scope of the "otherwise provided by Congress" provision of the 1902 act, and that Congress in the 1910 act did authorize transfer of the title to the water users association. In the 1940 contract, however, the memorandum states the water users association had waived its right to have title to the watershed lands so transferred. This opinion was based upon the record of negotiations for the 1940 contract, and the desire of the association for title to remain in the Government for tax reasons. The Solicitor's office advised that legal title to the watershed lands remains in the United States; that the association would have a right of set-off against project construction costs in an amount equal to lost net revenues from the watershed lands; and that the association would have no perpetual right to income or credit for watershed land revenues after payout of the construction costs. At that time, 1973 was the estimated year for payout.

When the 1940 contract was executed on October 9, 1940, plaintiff association and the water users had not made payments for the major portion of the construction costs of the project which would comply with the requirements of the 1910 act. Exactly when 51 percent of the construction costs was repaid is not clear in the record. The parties are in agreement that on November 30, 1974, the plaintiff association, on behalf of the water users, paid to the United States the final installment due on the $3,499,734.22 construction cost charged to the project and that the construction cost included the sum of $71,085.65, the amount assessed under the provisions of the 1910 act to be paid from the reclamation fund to extinguish Indian title to the watershed lands.